USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/09

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
TYRONE DOTSON,
                                      07 Civ. 5680 (GBD)(DFE)
                Petitioner,

        -against-                     REPORT AND RECOMMENDATION
                                      TO JUDGE DANIELS
DALE ARTUS, Superintendent of
Clinton Correctional Facility,

                Respondent.
--------------------------------x
```

DOUGLAS F. EATON, United States Magistrate Judge.

    The *pro se* habeas corpus petition of Tyrone Dotson challenges his conviction after a trial before Justice William Wetzel in Supreme Court, New York County. The jury found Dotson guilty of attempted kidnapping in the second degree. Dotson was a second violent felony offender. On March 24, 2004, Justice Wetzel setenced him to a determinate prison term of 14 years.

    Dotson was represented by Ms. Noel M. Ziegler during the suppression hearing, trial and sentencing. On appeal, he was represented by the Center for Appellate Litigation (Lisa Joy Robertson before the Appellate Division; Barbara Zolot on the application for leave to appeal to the Court of Appeals). The Appellate Division unanimously affirmed the conviction. *People v. Dotson,* 33 A.D.3d 396, 822 N.Y.S.2d 270 (1st Dept. Oct. 10, 2006), *leave denied,* 8 N.Y.3d 880, 832 N.Y.S.2d 492 (Ct. App. Feb. 15, 2007).

    Dotson mailed a timely habeas petition to our Court; our Pro Se Office received it on May 21, 2007.

    On November 7, 2007 Assistant Attorney General ("AAG") Frederick H. Wen served a 19-page Memorandum of Law and a Declaration annexing the state-court briefs and decisions as Exhibits A-F. (I shall cite to certain of those documents as "Exh.___.") AAG Wen also filed the transcripts of the state court proceedings.

    On March 18, 2008 I granted Dotson an extension until April 30, 2008 to submit any reply papers to me. On April 24, 2008, I received a letter from Dotson stating that he was recovering from

-1-

ear surgery and wanted me to extend the deadline for his reply. On May 21, 2008, I granted Dotson an extension until July 1, 2008 to submit any reply papers. He has not filed any reply papers; therefore, I will read his terse petition in light of the papers written by his attorneys during his direct appeal (Exh. A and Exh. D.)

I shall now quote the habeas petition's entire statement of its two grounds:

"<u>Ground One</u>: Right to Counsel."

I read this to incorporate Ms. Robertson's Point I: "The Court's refusal to substitute an attorney for appellant's assigned counsel, without conducting an inquiry into whether the trial would have been delayed or impeded, violated appellant's right to counsel of his choice. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6." (Exh. A, pp. 16-23.)

"<u>Ground Two</u>: Excessive Sentence."

I read this to incorporate Ms. Robertson's Point II: "The sentencing judge impermissibly penalized appellant for exercising his right to a trial when it sentenced him to an excessively lengthy prison term although, prior to sentence, it was aware that another judge had offered appellant a lesser sentence in exchange for a guilty plea. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6." (Exh. A, pp. 24-28.)

For the reasons set forth in today's Report, I recommend that Judge Daniels deny Dotson's petition.

### FACTUAL AND PROCEDURAL BACKGROUND

(I shall refer to the voir dire transcript as "V.D.Tr.," the trial transcript as "Tr.," and the sentencing transcript as "S.Tr.") While I shall describe the trial evidence in detail later, I shall now give a quick summary of the prosecution's evidence.

On July 20, 2002, at approximately 3:30 a.m., Tyrone Dotson, Jeffrey Samuel, and Jason Wallace drove to the East Village in Manhattan, and parked near the intersection of 7th Street and Second Avenue. Wallace and Samuel sat inside Wallace's car, while Dotson stood near the sidewalk. When Diane Mahiques and Betty Kallas walked by, Dotson grabbed Mahiques around the neck in a choke-hold. He dragged Mahiques towards the car, where Samuel sat in the back seat with the door open. The two women

fought off Dotson's attack, and Mahiques managed to break free. Dotson got in the car and the three men drove away. Mahiques memorized the car's license plate number and called 911. Within a few minutes, police officers arrived at the scene.

Detective Scott Prendergast discovered that Jason Wallace was the owner of the car bearing the license number provided by Mahiques. On July 23, 2002, Prendergast contacted Wallace, who drove that car to the Ninth Precinct. There Wallace wrote two statements; he described the crime and he supplied the names of Dotson and Samuel. Prendergast soon arrested Samuel, who was 6'2" or 6'3" tall, weighed 225 to 240 pounds, and had hair that was long on top and "up in the air a little bit."

Some seven months later, March 6, 2003, Wallace entered into a cooperation agreement, in which he agreed to testify against Dotson. (Tr. 81-88; Exh. B, p.9, n.5.)

On April 9, 2003, Dotson was arrested near Atlanta, Georgia. Prendergast traveled to Georgia and brought Dotson back to New York. The Georgia booking sheet stated that Dotson was 5'11" tall and weighed 177 pounds. Prendergast noted that Dotson was smaller than Samuel, and had shorter hair. While still in Georgia, Prendergast obtained a written statement from Dotson, who signed it. The following redacted version was read to the jury; Dotson said he knew the police had been looking for him, and he now put the blame on Samuel (nicknamed "Bam"):

> "My name is Tyrone Dotson. I'm currently living in the State of Georgia. I'm writing about a situation that happened last June. Me and a friend named Bam [Samuel] and his friend [Wallace] were going to a club downtown, could not get in. So we headed back to Brooklyn. But before going to Brooklyn **Bam wanted to talk to some girl walking with her girlfriend**, and the girl was not in[tere]sted. And **Bam pushed the girl to the ground and got in the car and we drove off.** I then told Bam friend to take me home and me and Bam had words. And the next day I told Bam he couldn't stay at my house no more because what he did was stupid. Bam then notified me the next day that he got arrested because somebody ran his friend's license plate and the cops were looking for me." (Exh. B, pp.9-10, n.6, emphasis added.)

On May 1, 2003, in separate police-arranged lineups, Mahiques and Kallas each identified Dotson as the man who had attacked Mahiques.

-3-

By New York County Indictment Number 3375/03, filed on May 16, 2003, Dotson and Samuel were jointly charged with one count of Attempted Kidnapping in the Second Degree. However, Jeffrey Samuel did not proceed to trial with Dotson, and his record is sealed pursuant to New York Criminal Procedure Law § 160.50. (Exh. A, p.1; Exh. B, p.2, n.1.)

Dotson's request for "reassignment of counsel"

Dotson's main point turns entirely on the following colloquy, which occurred in the courtroom on January 29, 2004, immediately before the start of jury selection:

> Defendant: I requested a lot of information that I haven't gotten.
> The Court: Tell your attorney. She will ask me. What is it you want?
> Defendant: Right now I put in for reassignment of counsel.
> The Court: You want a new attorney?
> Defendant: Yes. I have one waiting. I have one waiting ready to start for this trial.
> The Court: Right. Well I mean the truth is this case is sent out for trial. The witnesses are ready. It['] s too late now unless there is some compelling reason why I would have to stop this trial, start over with a new attorney. So that is not going to happen.
> Defendant: There is a lot of information I haven't gotten.
> Ms. Ziegler: Mr. Dotson particularly wanted information [that] concerns another defendant who may be a witness in this action, Jason Wallace. Mr. Dotson believes that we are entitled to have certain information about this potential witness because he actually was charged with the same offense, having acted in concert allegedly with Mr. Dotson and Mr. Samuel, the co-defendant at this time.[1] So my client feels that I haven't done my duty as an attorney. I have not been able to get that information.
> The Court: Is that what you said you are looking for, information about ... Mr. Wallace?
> Defendant: Yes, sir. I want to know why Jeffrey [Samuel] be my co-defendant and not Mr. Wallace.
> The Court: That is not information that you are entitled to under the law. I can't fault Ms. Ziegler for that.
> [The Prosecutor]: I may be heard? In the defendant's own statement which was obtained by the police after his arrest,

---

[1] As noted above, Jeffrey Samuel did not proceed to trial with Dotson, and Samuel's record is sealed. The V.D.Tr. makes clear that neither Samuel nor his attorney participated in the jury selection.

-4-

```
        he actually put the offense charged on the defendant with
        whom he is charged, Jeffrey Samuel.
        The Court:  The facts will come out.  So we are ready to go.
        Ms. Ziegler:  I would just, Your Honor if you can just be a
        little patient with me because I need to speak briefly with
        my client about jury trial versus waiver of the jury.  It
        won't take long.
        The Court:  Go ahead.
```

(V.D.Tr. 2-4.)  The jury selection process commenced at V.D.Tr. 27.  Ms. Ziegler acted as Dotson's attorney throughout the trial.

Despite Dotson's brief statement that "I have one waiting," neither he nor anyone else ever again gave any indication that his family actually had retained an attorney, let alone one who was ready to step into the jury selection or the rest of the trial.

The judge had ample reason to believe that Dotson's only complaint about Ms. Ziegler was a belief that she had been at fault for not obtaining advance information about one prosecution witness.  The judge then explained: "That is not information that you are entitled to under the law.  I can't fault Ms. Ziegler for that."  Dotson gave no indication that he was dissatisfied with this explanation, or that he had any other complaints about Ms. Ziegler.

No other attorney ever showed up or contacted the court. Even on appeal, Dotson and his appellate attorneys never supplied the name of any attorney chosen by Dotson or his family, or any evidence indicating that any such attorney ever existed.

The trial testimony

The jury heard the following testimony.

**Betty Kallas** testified at Tr. 20-67 as follows:

On July 19, 2002 around 9 p.m., Betty Kallas and Diane Mahiques had a drink at a bar at Houston Street and Elizabeth Street.  They walked around the East Village, and stopped at another bar at Avenue C and 8th Street.  At 3:30 a.m. on July 20, they were walking on 7th Street and were approaching Second Avenue.  Ahead of them, they saw a car with one door opened, and a man "on the right-hand side of the street."  Initially, they paid little attention to this.  (Tr. 22-24.)

-5-

Suddenly, the man grabbed Mahiques around the neck and began pulling her toward the car. Mahiques "pulled him down on the ground" and Kallas began "smashing" the man with her umbrella. A taxi cab went by and someone yelled out the window. The attacker gave up and got into the back seat of the car, which drove away. (Tr. 24-25.)

Mahiques got to her feet and said "What's that license plate." Using a cell phone, Mahiques called 911 and "screamed out the license plate number." The police soon arrived. (Tr. 25-26.)

More than nine months later, on May 3, 2003, Kallas went to the Ninth Precinct. She viewed a lineup, recognized the man who had attacked Mahiques, and selected Dotson.

**Detective Scott Prendergast** testified at Tr. 94A-124 as follows:

On July 20, 2002, he was assigned to investigate Mahiques's complaint of attempted kidnapping. He obtained a description of the attacker as a black male, 5' 10" with an athletic build, short hair, and medium to dark skin. The license plate number reported to 911 by Mahiques led to the vehicle owner, Jason Wallace. (Tr. 95-97.)

On July 23, 2002, Detective Prendergast spoke with Wallace, who gave a written statement and supplied the names of Dotson and Samuel as the two men who had been with him in the car on July 20. Wallace was then arrested. (Tr. 97-98.)

On April 9, 2003, Prendergast went to Atlanta, Georgia and participated in Dotson's arrest and return to New York. (Tr. 99-100.) At that time, Dotson was 5'11" tall and weighed 177 lbs. (Tr. 104.) Prendergast received a handwritten statement from Dotson, which has been quoted above. (Tr. 105-06.)

On May 1, 2003, Prendergast accompanied Diane Mahiques to view a lineup that included Dotson. She identified Dotson as the man who attempted to kidnap her. Separately, Prendergast accompanied Betty Kallas, who also identified Dotson as the attacker whom she had been "smashing" with her umbrella. (Tr. 109-14; see also Tr. 134-35.)

**Jason Wallace** testified at Tr. 68-94A and gave the jury evidence that the intent of the grabbing had been to kidnap Mahiques:

-6-

Wallace had met Tyrone ("Ty") Dotson on one occasion prior to the night of July 19, 2002. (Tr. 71.)

On that night, Wallace went with Dotson and Jeffrey ("Bam") Samuel to a store. They proceeded to go to a restaurant, an apartment, and another store, at 118th Street and Third Avenue, where they purchased marijuana. They smoked the marijuana and went to a nearby club. They left the club around 3:00 a.m. and got into Wallace's car, with Wallace driving. (Tr. 71-74.)

As they drove downtown, Dotson and Samuel spoke to each other. Wallace asked what they were speaking about. Samuel responded that he had told Dotson "doggie would not be down with grabbing a bitch and taking her over the bridge." (Tr. 74.) Dotson understood that "doggie" referred to himself and he responded, "no, I wouldn't be down - - put nobody in my car." (Tr. 74.) Nevertheless, Dotson and Samuel continued speaking to each other, discussing who would grab a woman, and who would hold that woman down in the back seat of the car. (Tr. 75.)

At Dotson's request, Wallace stopped his car at Second Avenue and 20th Street. Dotson got out of the car, went into a building, and came out a few minutes later. The three men resumed driving. (Tr. 76-77.)

Dotson told Wallace to stop the car at Second Avenue and 7th Street. Dotson got out; Wallace and Samuel stayed in the car. Wallace testified: "[I] [h]eard a lady scream. And as I looked to my right, I observed Ty [Dotson] having the lady in the chokehold from the behind, from behind .... [Her friend] was hitting him over the head with a bag or something. And upon further observation, I noticed my rear passenger door was open. And I overheard Bam [Samuel] in the back saying, Get her in here, Doggie. Then either he stumbled, the lady fell out of his arms. And he jumped in the car. And I just took off." (Tr. 77-78.)

**Diane Mahiques** testified at Tr. 126-54 as follows:

On July 19, 2002, Mahiques met Kallas at about 9 p.m. at a pub near Houston Street. One of Kallas's friends joined them, and the three talked for a couple of hours. Kallas and Mahiques left the bar and walked around the area until they decided on another bar. (Tr. 130-31.)

The two women later left that bar. At around 3:30 a.m., on July 20, 2002, they were walking on the sidewalk on 7th Street between First and Second Avenues, with Mahiques being the one nearer to the curb. As they were walking and talking, Mahiques

-7-

noticed a man in the street looking down, she thought "at an address or cell phone or something." (Tr. 132.) As Mahiques and Kallas got closer to him, he attacked Mahiques. Mahiques testified:

> "[J]ust as - - so fast, he was - - he just came behind me and put his arm around my neck really tightly. So tightly that I couldn't - - you know, they teach you in self-defense class to put your neck down, put your head down. I couldn't do it. It was so - - it was so strong, the choke hold, that I couldn't really breathe. And, you know, she [Kallas] was just in shock. I mean, it happened so fast. And at that point, I was struggling to get away from him. But, there was just no way. And I was being dragged to the left. I felt my body being pushed this way. And as I looked over, I saw that the car door was opened in the back seat. And that's when I panicked. And I - - I started to push my head down. It was so painful, but I didn't really care. And I was pushing down. Finally, she [Kallas] started to react and started hitting him over the head and all over the body with an umbrella. And I - - I managed to fall to the ground. He loosened his hold. And at that point I was on the floor. And I looked up, and she was hitting him so repeatedly that he had to move to kind of shield himself from the blows and get closer to the car. And I started to kick him. And at that point, that's when I really saw him. Because I had not seen him when he was behind me at all. And just - - in another ten seconds he had opened the car door, and he got in the car, and the car drove away. But, luckily, there was another car that was racing down the street. And - - so they couldn't really turn right away. So, at that point I was so mad that I looked at the license plate number and I memorized it."

(Tr. 132-33.)

Shortly after, Mahiques called 911 and the police responded promptly. (Tr. 133-34.)

**Tyrone Dotson** was the sole defense witness. He testified that on July 19, 2002, Samuel and Wallace picked him up around 9:30 p.m. or 10:00 p.m. at 103rd Street and Third Avenue. They went downtown, got off somewhere in midtown, and went to the store to "get some beers and stuff." (Tr. 161.)

-8-

They continued downtown and stopped at a club on 22nd Street and "either Second or Fifth Avenue." (Tr. 164.) He was not sure why they stopped; he believed Samuel needed to see a friend or pick something up. Dotson testified that Samuel tried to get into the crowded club but was not permitted to enter. (Tr. 164-65.) Dotson stayed in the car and watched as Samuel stopped and spoke to some girls on the sidewalk. Two of them appeared to dismiss Samuel. Samuel pushed one of them and she fell to the "floor." Samuel jumped back into the car, and the three men drove off. Dotson testified that he did not touch any of the women. (Tr. 165.) He denied grabbing any woman in a choke-hold that night. (Tr. 167, 178-79.)

Dotson told the jury that the only incident of pushing or grabbing occurred on 22nd Street, and that the three men never went to the East Village on that night. (Tr. 177.)

<u>The verdict and sentence</u>

On February 4, 2004, the jury found Dotson guilty of attempted kidnapping in the second degree. (Tr. 73.)

At the sentencing hearing on March 24, 2004, the prosecutor presented a letter from the victim, Diane Mahiques:

> Dear Sir, I'm writing to you to beg you to give Tyrone Dotson the maximum sentence allowed by law for his most recent conviction. He's a very dangerous individual. God knows what could have happened to me if he had managed to force me inside the car that night. I might not be writing this letter to you today.
> Mr. Dotson's assault on me was violent and vicious and as a result I sustained bruising around my neck and shoulders and substantial pain in those areas for weeks afterward. I have also sustained extreme emotional pain which affects me to this day because of the attack. I become extremely uneasy and fearful if people in the street, walk closely to me. Even in broad daylight, I am easily startled by noises when I walk outside and freeze up if I hear someone running toward me. I'm sure these reactions will subside one day, but a year and a half after the attack I am still suffering.
> I'm extremely concerned that his next victim may not be so lucky.

(S.Tr. 2-3.)

The prosecutor also informed the judge that Dotson was a second violent predicate offender, having been previously convicted of robbery in the second degree. The prosecutor said that Dotson had exhibited a predatory nature in the prior case just as he had in the present case. (S.Tr. 4-5.)

Dotson's attorney, Ms. Zeigler, informed the judge of some mitigating factors. There were no weapons used in the attempted kidnapping, and the "only violence was the arm, the muscular arm around the complaining witness' neck." (S.Tr. 7.) The victim was not punched or thrown to the ground. Ms. Ziegler also stated that, before the case had progressed into the trial Part, another judge (Judge White) had offered Dotson a sentence of eight years if he wished to plead guilty, but Dotson had declined the offer. (S.Tr. 7-8.)

Justice Wetzel stated to Dotson:

> Well, let me say this. I'm going to sentence you based upon the verdict that the jury rendered.
> That story you just told me was heard by the jury and they outrightly rejected it,
> And I think they were wise to do so.
> It makes no sense whatsoever.
> I think the evidence in this case was clear and convincing.
> So I have to make a determination as to what is the appropriate sentence within the sentencing ranges provided.
> You have a prior felony conviction. It's not at all irrelevant to this consideration. In fact, it's relevant to determine exactly what sentence you get because the predicate status is not really important in this case because it only bears on the minimum sentence, and I would never have given you less than seven years even if this were your first offense.
> But I hearken to the words of the victim that only God knows what might have happened had she been put in the back of that car. And I credit the testimony of, I think it was Mr. Wallace, who said that the intent was to ... take her somewhere, over the Bridge to Brooklyn.

(S.Tr. 11-12.)

He continued:

> So looking at the seriousness of this offense, the level of violence, the predatory nature of this, given

-10-

that you basically hunted down the weakest, most
vulnerable victims, and the fact that you hunted down
the smaller of the two female victims, and I'm not
going to speculate as to what you ultimately had in
mind, but I think it's true that the victim rightly and
understandably lies awake some nights wondering what
may have been the object of this exercise.  So I think
it warrants a very severe sentence.
    For that reason, I sentence this defendant to a
determinate sentence of 14 years in prison, followed by
the post-release supervision and mandatory surcharge.

(S.Tr. 12-13.)  The prison sentence was one year less than the
statutory maximum of 15 years.

The direct appeal

In July 2005, Lisa Joy Robertson of the Center for Appellate
Litigation filed the appellate brief on behalf of Dotson.  (Exh.
B.)  She raised the same two points that are now reflected in the
habeas petition.  On October 10, 2006, the Appellate Division
wrote a short opinion (with my emphasis added in bold font):

"The court properly exercised its discretion in
denying defendant's request for a substitution of
counsel, and there was no violation of defendant's
right to retain counsel of his own choosing (see People
v. Arroyave, 49 N.Y.2d 264, 270-71, 401 N.E.2d 393, 425
N.Y.S.2d 282 [1980]).  As jury selection was about to
commence, defendant asked for a 'reassignment' of
counsel claiming he had an attorney waiting and ready
to proceed.  However, defendant never identified this
attorney, or indicated that he had retained an attorney
or had the means to do so, and **no such attorney ever
contacted the court** (compare People v. Thomas, 70
N.Y.2d 1233, 552 N.Y.S.2d 555 [1990]).
    "We perceive no basis for reducing the sentence."

People v. Dotson, 33 A.D.3d 396, 822 N.Y.2d 270 (1st Dep't, Oct.
10, 2006).

    Ms. Robertson's colleague, Barbara Zolot, sought leave to
appeal further.  On November 13, 2006, she sent a three-page
letter to Associate Judge Eugene F. Pigott, Jr.  (Exh. D.)
Despite Dotson's telling the trial judge "Right now I put in for
reassignment of counsel," she argued that "he was not asking for
new assigned counsel."  (Exh. D, p. 2.)  She argued that the
colloquy involved "defendant's request for new retained counsel."

(Exh. D, p.1, emphasis in the original.) She simply did not deal with the Appellate Division's crucial statement that "defendant never identified this attorney, or indicated that he had retained an attorney or had the means to do so, and no such attorney ever contacted the court." Judge Pigott denied leave. (Exh. F.)

<h3 style="text-align:center">DISCUSSION OF DOTSON'S HABEAS PETITION</h3>

"<u>Ground One</u>: Right to Counsel."

As noted earlier, I read this to incorporate Ms. Robertson's Point I to the Appellate Division, namely: "The court's refusal to substitute an attorney for appellant's assigned counsel, without conducting an inquiry into whether the trial would have been delayed or impeded, violated appellant's right to counsel of his choice. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6."

In Point I, appellate counsel mentioned the Sixth Amendment and Dotson's "right to counsel of his choice," but she cited no federal case in Point I, let alone a Supreme Court case. (See Exh. A, pp. 2, 16, 17, 23.)

28 U.S.C. § 2254(d) provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in the State court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" clause means that the writ may issue in two circumstances: (1) if the state court decision is contrary to Supreme Court precedent on a question of law; or (2) if the state court decision addresses "a set of materially indistinguishable facts" from a relevant Supreme Court case and comes to a conclusion different from the conclusion reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The "unreasonable application" clause means that the state court "identifies the correct governing legal rule" but "unreasonably applies it to the facts or unreasonably extends a

legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003).

Moreover, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." In Dotson's case, the Appellate Division made a determination of a crucial factual issue. It determined that Dotson had made no clear statement that he or his family had retained any attorney. This factual determination was not unreasonable. Dotson used the phrase "reassignment of counsel." He then said "I have one waiting," but he never used the word "retained" or any equivalent. He has never supplied the name of any retained attorney, and no such attorney ever contacted the court.

Ms. Robertson's brief to the Appellate Division (Exh. A) talked repeatedly about "appellant's new counsel" (p. 17) and "his new attorney" (p. 18). She asserted: "Appellant had selected someone he believed he could trust. ... [N]ew counsel was ready to step in immediately and start trial." (Exh. A, pp. 20-21.) Yet her brief was unable to give the alleged attorney's name, and was even unable to state whether the alleged attorney was a "he or she." (Exh. A, pp. 22.)

Ms. Robertson's brief relied on two state cases, *People v. Arroyave,* 49 N.Y.2d 264 (Ct. App. 1980), and *People v. Thomas,* 70 N.Y.2d 859 (Ct. App. 1987). In both of those cases, a retained attorney actually came into the courtroom. In *Arroyave,* the high court of New York noted the importance of allowing defendants to be represented by counsel of their own choosing. However, it also wrote: "Although a defendant has the constitutionally guaranteed right to be defended by counsel of his own choosing, this right is qualified in the sense that a defendant may not employ such right as a means to delay judicial proceedings." 49 N.Y.2d at 271. On the eve of trial, Arroyave's new attorney came into court and presented a 5-month-old letter by which Arroyave had sought to retain him. The new attorney asserted that the letter had been delayed by the Department of Correction, and that he had just received it earlier that day. *Id.* at 273. The New York Court of Appeals remanded the case to the trial court to determine whether the Department of Correction, and not Arroyave,

-13-

had been responsible for the delay in obtaining new counsel. If the trial court were to determine that Arroyave had not been responsible for the delay, then Arroyave would be entitled to a new trial. *Id.*

In *Thomas*, the trial judge granted the defendant's request to substitute new counsel. However, the high court of New York ruled that the judge had imposed an improper condition on the new attorney, namely, that he promise not to move for a continuance if the judge granted the substitution. For that reason, the New York Court of Appeals ordered a new trial. 70 N.Y.2d at 860.

Dotson's case is distinguishable from both *Arroyave* and *Thomas*. In both of those cases, the new attorney was actually present in court. In *Arroyave,* the new attorney presented a specific reason why the defendant was blameless for the delay in retaining the new attorney. 49 N.Y.2d at 273. By contrast, Dotson presented no reason why he delayed until jury selection before asserting that an alleged new attorney existed. Dotson offered no information about the alleged new attorney, and no such attorney ever contacted the court. Moreover, Dotson's appellate attorneys never supplied the name of any attorney chosen by Dotson or his family - - nor any evidence to show that any such attorney ever existed.

The Sixth Amendment to the U.S. Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." The U.S. Supreme Court has stated that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez,* 548 U.S. 140, 151 (2006), *citing Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 626 (1989).

Even when a retained counsel actually exists, the right to counsel of choice is not absolute. The Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Wheat, 486 U.S.* at 152. The same decision also recognized a trial court's power "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id.*

Therefore, the Appellate Division's decision was not contrary to clearly established federal law, nor did it involve an unreasonable application of such law.

"Ground Two: Excessive Sentence."

As noted earlier, I read this to incorporate Ms. Robertson's Point II to the Appellate Division, namely: "The sentencing judge impermissibly penalized appellant for exercising his right to a trial when it sentenced him to an excessively lengthy prison term although prior to sentence, it was aware that another judge had offered appellant a lesser sentence in exchange for a guilty plea. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6."

Ms. Robertson's brief claimed that the sentence of 14 years was excessive in light of a prior judge's offer of 8 years if Dotson were to plead guilty. She argued that the discrepancy suggested that Dotson was punished for going to trial. (Ex. A., pp. 24-28.)

This claim is not cognizable on habeas review. A challenge to the term of a sentence does not raise a constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381 (2d Cir. 1992). Under New York's sentencing scheme, attempted second-degree kidnapping is classified as a class C violent felony. Penal Law §70.02(1)(a)-(b), §110.05(4), §135.20. Dotson, as a second violent felony offender, faced a minimum determinate term of at least 7 years and a maximum determinate term of 15 years. Penal Law § 70.04(1)(a), §70.04(3)(b). His 14-year sentence was at the higher end of the range, but it clearly fell within the statutory range.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that judge Daniels deny Dotson's habeas corpus petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e. **no later than August 18, 2009**), by mailing written objections to the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable George B. Daniels, U.S.D.J., at Room 630, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Heath and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. Rules 72, 6(a), and 6(d). Any request for an extension of time must be addressed to Judge Daniels.

_____
DOUGLAS F. EATON
United States Magistrate Judge
U.S. Courthouse
500 Pearl Street, Room 1360
New York, NY 10007

Dated:    New York, New York
          July 30, 2009

Copies of this Report and Recommendation are being mailed to:

Tyrone Dotson, DIN # 04R1335
Wende Correctional Facility
3040 Wende Road
Alden, New York 14004-1187

Frederick H. Wen, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, New York 10271-0332

Hon. George B. Daniels